**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

**ANDREW JOSEPH STUBBS,**

     **Petitioner,**                §

**v.**                          §           **CIVIL NO. 2:18-CV-289**

**LORIE DAVIS,**              §

     **Respondent.**

**AMENDED RESPONSE TO RESPONDENT'S**
**MOTION FOR SUMMARY JUDGMENT**

Comes now the petitioner ANDREW JOSEPH STUBBS (Mr. Stubbs), and files this amended response to the Respondent's motion for summary judgment, as follows:

**I.**    **Procedure and Facts**

    **A.**    **Introduction**

Mr. Stubbs seeks relief through his petition for a writ of habeas corpus via 28 U.S.C. § 2254. In turn, the Respondent has made a motion for summary judgment. To date, the Respondent does not object to the Court's jurisdiction in this matter, nor has the Respondent alleged that Mr. Stubbs' § 2254 petition is successive, unexhausted or time-barred. The Respondent's motion for summary judgment summarizes Mr. Stubbs' claims and argues against the merits of each claim. Mr. Stubbs filed a response. As ordered by the Court, Mr. Stubbs, through

undersigned, court-appointed counsel, herein amends Mr. Stubbs' response to Respondent's motion for summary judgment.   The instant amended response supplements and does not replace Mr. Stubbs' previously filed pleadings.

Mr. Stubbs presents a case of actual innocence and ineffective assistance of trial counsel that resulted in Mr. Stubbs making an unknowing and involuntary plea of guilty.   But for trial counsels substandard performance, Mr. Stubbs would not have pled guilty and would have elected to proceed to trial.  See, *infra*.

### B.     Proceedings Below

Mr. Stubbs is in custody at a TDCJ facility in Beeville, Texas.  Mr. Stubbs is serving his three, concurrent 18-year prison sentences which are the subject of the instant petition filed *pro se* by Mr. Stubbs in 2018.   A thorough review of the proceedings below is necessary.

### 1.     The Trial Court Preliminary Hearing, Plea of Guilty and Deferred Adjudication

The underlying case began with Mr. Stubbs' October 21, 2015 arrest in Corpus Christi, Texas on three charges of sexual assault.   ECF 16-2, at 7. Although Mr. Stubbs reported to the trial court no income or assets, bond was set at $200,000 on each of the three counts.  ECF 16-2, at 7-9, 11.  On October 22, 2015, a Nueces County magistrate appointed attorney Randy Pretzer (Mr. Pretzer) to represent Mr. Stubbs.   ECF 16-2, at 6. The Nueces County District Attorney obtained an indictment against Mr. Stubbs on January 15, 2016 in the 319th

Distirct Court, Nueces County, Texas.  ECF 16-2, at 4.  The indictment charged Mr. Stubbs with sexually assaulting a child named L.R. (14 years old at the time) in three counts—all alleged to have occurred on the same date in October 2015 in violation of Tex. Pen Code Sec. 22.011.  ECF 16-2, at 4.  Each count was a second degree felony.   The Nueces County Assistant District Attorney handling Mr. Stubbs' case in the trial court was Rebecca Lake (Ms. Lake).  The alleged victim, L.R. is the child of Mr. Stubbs' girlfriend, Ann Lopez (Ms. Lopez).

On January 28, 2016, the alleged victim, L.R., wrote a recantation statement in which L.R. expressed her remorse for having lied about Mr. Stubbs sexually assaulting her.  ECF 16-4, at 51-52.  In the statement L.R. wrote, apparently in her own hand, that she was with her best friend L.F. and her boyfriend E.LNU. and told L.F. that she wanted to "get rid" of Mr. Stubbs because he was taking her mother's attention.  ECF 16-4, at 52.  Her friend L.F. went to the counselor's office and made an outcry for L.R. that Mr. Stubbs had sexually abused L.R.  ECF 16-4, at 52.  L.R. stated that Mr. Stubbs never put a hand on her, that she lied, that L.R. loves Mr. Stubbs like a dad, and that she is very sorry.  ECF 16-4, at 51-52.

On February 15, 2016,  Mr. Stubbs made a request from his confinement in jail to the trial court to have a bond hearing and stated that he had been in custody for 115 days, he would like to speak to the district attorney and the judge and that his lawyer was not answering his calls or the calls from his family.  ECF 16-2, at

68.  "I am asking U (sic) for this chance please help me thank you," in closing Mr. Stubbs wrote to the trial court.  ECF 16-2, at 68.

The trial court had set an arraignment on February 22, 2016, see, ECF 16-2, 68, 69, and according to the trial court's docket sheet an arraignment hearing was held on February 22.   ECF 16-6, at 81.   There is also a note on Mr. Stubbs' February 15, 2016 inmate communication form suggesting he was indeed arraigned on February 22.  ECF 16-2, at 68.  Additionally, although not a part of the record for this Court, the Nueces County online docket shows that Mr. Stubbs was arraigned on February 22 with Mr. Pretzer present:

| 02/22/2016 | **Case Event Conv** |
| | *DF. ARRAIGNED W/ATY. RANDY PRETZER - NOT GUILTY PLEA ENTERED* |
| 02/22/2016 | **Court Hearing**  (9:00 AM) (Judicial Officer Stith, David) |
| | *ARRAIGNMENT* |

See,   https://portal-txnueces.tylertech.cloud/PublicAccess/CaseDetail.aspx?CaseID=1963463.

Then, on March 1, 2016, Mr. Stubbs made another request from the jail addressing the trial court.  ECF 16-2, at 70.  Mr. Stubbs told the court he wanted to request "pretrial probation" with an ankle monitor and daily probation visits.  ECF 16-2, at 70.  Mr. Stubbs complained again that his lawyer was not answering his or his family's calls.  ECF 16-2, at 70.  Mr. Stubbs informed the trial court that he had

been in custody for 130 days, asked the trial court to "help please" and suggested the trial court could verify his family's address and phone number, which he provided in the request.  ECF 16-2, at 70.  "My lawyer hasn't done any thing to help me so I am tring [*sic*] to do this myself sir please hear me your honor I need to see you please thank you," pleaded Mr. Stubbs in the request.  ECF 16-2, at 70.  In reply to his request (date unknown), the trial court responded that a hearing was set on March 21, 2016 and that he could request new counsel at that date.  ECF 16-2, at 70.  Noted also on the request form is what appears to be a note to Mr. Prezter from the trial court to pay Mr. Stubbs a visit.  ECF 16-2, at 70.

On March 17, 2016, Mr. Pretzer filed a motion requesting a reduction in Mr. Stubbs' bond.  ECF 16-2, at 77-78.  The motion for bond reduction contains no information specific to Mr. Stubbs' particular circumstances advocating the details of Mr. Stubbs' situation. ECF 16-2, at 77-78.

On March 21, 2016, despite the fact that it appears Mr. Stubbs was arraigned on February 22, 2016, Mr. Stubbs was arraigned again in open court.  ECF 16-9, at 11.  Mr. Stubbs informed the court that he still had not received a copy of the indictment.  ECF 16-9, at 4.  Mr. Pretzer stated that he himself had received a copy of the indictment and that "I will go over it with him."  ECF 16-9, at 4.  Mr. Pretzer also stated that he had all of the discovery.  ECF 16-9, at 12.  Ms. Lake handed the trial court the "primary discovery packet" and referred the court to the "medical findings" noting a tear to the anus and "sperm present upon examination of this

victim." ECF 16-9, at 5-6.[1]   Mr. Pretzer then made preliminary inquiries of Mr. Stubbs regarding his suitability for release on bond but, left his questioning short and presented no proffer or other witness.  ECF 16-9, at 7-8.  Mr. Stubbs testified that he worked as a mechanic in people's back yards and intended to live at a trailer park at 4140 Violet Road.[2]  ECF 16-9, at 7.  The parties then discussed with the trial court that the victim had given a written statement recanting her outcry against Mr. Stubbs and also the pending results of DNA testing. ECF 16-9, at 9-10.  The trial court thought it could take a year to get the DNA results.  ECF 16-9, at 9.  Mr. Pretzer opined it could be another six or seven months from the trial date.  ECF 16-9, at 9.[3]  Next, and evidently *sua sponte*, Mr. Pretzer asked the trial court to re-visit the bond matter because the prosecutor, Ms. Lake, had to take care of a trial she was involved in.  ECF 16-9, at 10.  Ms. Lake then stated that Mr. Pretzer had requested an offer from her on that day.  ECF 16-9, at 11.  The trial court suggested that the parties speak to the victim considering that the victim was giving two completely conflicting sides to the story.  ECF 16-9, at 10.  The trial court stated that it would like to know more information before "I do anything with the case," "so somebody needs to help me get to the bottom of that."  ECF 16-9, at

---

[1] As explained *infra*, L.R. never made an outcry of anal penetration and laboratory results later confirmed there was no sperm present.

[2] This is the address where Mr. Stubbs was later arrested days after being released on deferred adjudication probation.  This address was a trailer house where numerous adults where staying.

[3] DPS issued two forensic reports regarding analysis of the swabs taken from L.R. and Mr. Stubbs 1 1/2 and 3 1/2 months from the date of this hearing.  See, *infra*.

10.  Mr. Pretzer stated he had not spoken with the victim and was going to "leave that with the State."  ECF 16-9, at 11.  The trial court then inquired of Ms. Lake:

> Court:        Have you talked to her?  Have you brought her in?
>
> Ms. Lake:    I had her contacted yes —  I'm sorry, not yesterday but last week, just to notify her of this hearing, but I wanted to see the results of the hearing before I update her on the status of the case.

ECF 16-9, at 11.  Ms. Lake had not spoken to L.R.  The trial court asked Ms. Lake to find out the status of the DNA results and that the court would not be opposed to the victim being called at the next hearing.  ECF 16-9, at 11.  Ms. Lake stated that she would "look into" the timing of the DNA laboratory results and if the "case has even been assigned to an analyst."  ECF 16-9, at 10.

Mr. Stubbs pled guilty at the next hearing on April 7, 2016.  ECF 16-10, at 1. On the same day, just before lunch at 11:45 am, Ms. Lake made contact with L.R. and L.R.'s mother as memorialized in Ms. Lake's notes.    ECF 16-4, at 48. However despite the exculpatory evidence aware to both sides at the time of the plea, see, infra, Ms. Lake's notes of her contact with L.R. and her mother are void of any inquiry as to the validity of L.R.'s recantations and the truth of the allegations.  ECF 16-4, at 48.  L.R.'s mother, Ms. Lopez said that she has moved on and has a new boyfriend and that she no longer wants to see Mr. Stubbs.  ECF 16-4, at 48.  L.R. said that she agreed with her mother and no longer wants to see

Mr. Stubbs either.   ECF 16-4, at 48.   Ms. Lake's note detailed that L.R. enjoys choir and art classes.  ECF 16-4, at 48.

> The trial court's plea colloquy began with:
>
> The Court:   … Mr. Stubbs, have you gone over with your attorney —
>
> Mr. Stubbs:  Yes, sir.
>
> The Court:   — regarding the charge pending against you in the indictment?  Yes?
>
> Mr. Stubbs:  Yes, sir.  At this point I just want my life back.

ECF 16-10, at 5.   The court informed Mr. Stubbs that he would have "duty to report that would last for as long as the rest of your life."  ECF 16-10, at 7.   Mr. Stubbs responded that he understood that.  ECF 16-10, at 7.  Ms. Lake stated she had spoken to the mother and L.R. and that the mother was present in court and supported the plea bargain.   ECF 16-10, at 7.   Ms. Lake told the trial court that L.R. told her that L.R. never wants to see Mr. Stubbs again.   ECF 16-10, at 10. The trial court sentenced Mr. Stubbs to 10 years' deferred adjudication probation along with several conditions including being placed on the sex offender caseload and no contact with the victim or the victim's family.  ECF 16-10, at 9.

### 2.    The Evidence in the Judicial Confession

The State's evidence made part of the record at the guilty plea is contained in the judicial confession, is as follows, in pertinent part.

On October 21, 2015, police dispatched to Driscoll Middle School in Corpus Christi, Texas regarding L.R.'s outcry against Mr. Stubbs.  ECF 16-15, at 7.  L.R. was speaking to a counsel at the school and said that Mr. Stubbs sexually assaulted her the day before.  ECF 16-15, at 12.  L.R. had made an outcry to another student who spoke to a coach about it before L.R. spoke to the counselor.  ECF 16-15, at 33.  CPS was informed and police went to the residence were Mr. Stubbs resided with L.R. and L.R.'s mother, Ms. Lopez, and arrested Mr. Stubbs.  ECF 16-15, at 12, 33.  With Mr. Stubbs' consent, police searched the residence taking photos and collecting evidence.   ECF 16-15, at 12, 19.   Police collected various items including a cellphone and swabbed the area of the alleged assault.  ECF 16-15, at 16-17.   The living conditions in the house were "substandard for human occupation."  ECF 16-15, at 19.

The Child Advocacy Center (CAC) interviewed L.R. that same day. L.R.'s story starts with her stepdad, Mr. Stubbs, approaching her in the kitchen, giving her a tight hug and would not let go.  ECF 16-15, at 33. Mr. Stubbs then took her to the living room, fingered her vagina and performed oral sex on her.  ECF 16-15, at 33. Mr. Stubbs then laid her on the floor and penetrated her vagina with his penis. ECF 16-15, at 33.  L.R. stated that these sexual acts occurred with her clothes on and that she was wearing shorts and a muscle shirt.  ECF 16-15, at 73.  L.R. stated that Mr. Stubbs used a tear in L.R.'s shorts to finger her and that he lifted up her shorts in order to perform oral sex.  ECF 16-15, at 73.  L.R. stated she had never

had sexual intercourse before this assault.  ECF 16-15, at 33.  A few days prior to this assault, Mr. Stubbs had asked to lick her vagina.  ECF 16-15, at 33.

Police interviewed Mr. Stubbs.  Mr. Stubbs waived his Miranda warnings and consented to giving his DNA.  ECF 16-15, at 33.  Mr. Stubbs immediately denied the allegations.  ECF 16-15, at 33.  Mr. Stubbs stated that L.R. was a virgin and that "the proof is right there in the swabs."  ECF 16-15, at 33.  Mr. Stubbs also added that he had a good relationship with the children in the household but, he kept catching L.R. communicating with men.  ECF 16-15, at 33.

Police interviewed L.R.'s mother, Ann Lopez (Ms. Lopez).  Ms. Lopez stated she never leaves L.R. alone with Mr. Stubbs and does not understand how this could have happened.  ECF 16-15, at 34.  Ms. Lopez reiterated Mr. Stubbs' statement that L.R. has been communicating with men.  ECF 16-15, at 34.

L.R. was given a SANE exam on October 21, 2015.  The report of the exam gives L.R.'s statement regarding the assault.  L.R. states Mr. Stubbs hugged her in the kitchen, took her to the living room, pulled down L.R.'s shorts and underwear, fingered her vagina, performed oral sex on L.R., then penetrated her vagina with his penis.  ECF 16-15, at 34.  L.R. stated she went to her bedroom and started cutting her forearm with a box cutter.  ECF 16-15, at 34.  When L.R. was 11 years old Mr. Stubbs told her he had a crush on her and tried to kiss her and "after that he never did anything until last night."  ECF 16-15, at 34.  The SANE report gives results of a vaginal Christmas tree stain which had "no spermatozoa present."  ECF

16-15, at 98.    However, a vaginal wet prep test was performed and reported "spermatozoa present."   ECF 16-15, at 99.   In her statement during the SANE exam, L.R. stated that she was wearing a muscle shirt, shorts and underwear, and that Mr. Stubbs pulled down her shorts and her underwear and started fingering her.   ECF 16-15, at 115.   This was inconsistent with her video statement at the CAC that she did not have underwear on and that Mr. Stubbs did not pull down or remove her clothing.  See, *supra*.   L.R. was reported to be menstruating at the time of the exam.   ECF 16-15, at 115.   L.R. did not report that she vomited after the assault.   ECF 16-15, at 106, 115.   However, L.R. told CPS that she had vomited after the assault.   ECF 16-15, at 62.   The only trauma noted in the exam was a .5 cm. tear at the anus.   ECF 16-15, at 117.   The SANE nurse stated there was not an outcry regarding anal penetration.   ECF 16-15, at 73.   Multiple swabs were taken of L.R. for laboratory testing.   ECF 16-15, at 119.

Police interviewed L.R.'s classmate, L.F., who stated that L.R. whispered to her that L.R.'s stepfather raped L.R.   ECF 16-15, at 36.   L.F. then informed a coach at the middle school.   ECF 16-15, at 36.

There are reports from the Texas Department of Family and Protective Services (CPS) in the discovery packet.   ECF 16-15, at 48.   L.R.'s statement in the CPS records includes that on the Sunday before this assault, Mr. Stubbs wanted to lick L.R.'s vagina, her sister walked in, L.R. told her mother about it and L.R.'s mother said that she would kick Mr. Stubbs out of the house "if he did anything."

ECF 16-15, at 51.  The CPS record notes lacerations on L.R.'s arm, that L.R. stated she had been cutting herself since the first outcry and that she would continue to cut herself if "this stuff keeps on going."  ECF 16-15, at 52.  L.R. stated that she had never had sex before and that she was bleeding from her vagina.  ECF 16-15, at 52.  Ms. Lopez told CPS that L.R. was lying, that she has lied before about things like this and she is probably lying again.  ECF 16-15, at 74.  CPS informed Ms. Lopez that semen was found in L.R. vagina and that it likely belonged to Mr. Stubbs.  ECF 16-15, at 74.  Ms. Lopez responded that L.R. was probably having sex with someone because L.R. has been caught before talking to an older man.  ECF 16-15, at 74.  Ms. Lopez hugged L.R. and told her that when Mr. Stubbs gets out of jail he will not be returning to their home and that it will just be Ms. Lopez and the children and she will have no other men in her life.  ECF 16-15, at 74, 78.  Ms. Lopez told CPS that she wanted to believe L.R. but that she has lied before about these kinds of things.  ECF 16-15, at 74.  Ms. Lopez stated that she has been trying to get rid of Mr. Stubbs for a long time because he does not work and lives of her and her children's money.  ECF 16-15, at 74.

L.R. had been seen at the CAC on two previous occasions, in 2009 for sexual abuse by Ms. Lopez's former boyfriend where L.R. made no outcry.  ECF 16-15, at 73.  The other previous occasion was in April 2105 where L.R. told her counselor Mr. Stubbs had licked her vagina but when at the CAC L.R. gave no outcry.  ECF 16-15, at 73.   There is a note relating to the April 2015 outcry of an

Investigator Richard Searcy (Inv. Searcy) in which Inv. Searcy "advised during his investigation [L.R.] said a boy at school made everything up because she didn't want to be his girlfriend." ECF 16-15, at 72. Inv. Searcy went on to say that Ms. Lopez said that the step-father was not in the home, and when he spoke to the step-father he was in Wisconsin. ECF 16-15, at 72. L.R. was taken to the CAC for Inv. Searcy's investigation. ECF 16-15, at 72. This April 2015 outcry against Mr. Stubbs was "ruled out" by CPS. ECF 16-15, at 75.

### 3.    The Video Recantation and Facebook Posts

There was other exculpatory evidence that was not made part of the record until Mr. Stubbs' later motion for new trial hearing. See, *infra*. Mr. Stubbs' nice, Trisha Caley (Ms. Caley) recorded on her phone while L.R. gave a verbal recantation of the outcry against Mr. Stubbs. D.E. 48 (Defendant's Exhibit 1). The video is 3 minutes and 20 seconds long and shows L.R. holding a paper with an apparent type-written paragraph. D.E. 48 (Defendant's Exhibit 1). Ms. Caley testified that while recording the video, L.R. had an actual statement printed out. ECF 16-13, at 69. In the video L.R. states that Mr. Stubbs caught L.R. on a dating site on her phone and that she was texting "so many guys" and Mr. Stubbs told her to delete them or he would tell L.R.'s mother and she would never have a phone again if she went on a dating site. D.E. 48 (Defendant's Exhibit 1). L.R. goes on to say that at school she was talking about how she was tired of Mr. Stubbs and he was taking her mother's attention. D.E. 48 (Defendant's Exhibit 1). So her and

her friend, L.F., went to the counselor and made a false statement and L.F.'s boyfriend was in on it.   D.E. 48 (Defendant's Exhibit 1).   L.R. also talked about engaging in sexual activity with a male behind her house and her sister catching her.  D.E. 48 (Defendant's Exhibit 1).  L.R. said she blamed Mr. Stubbs for it.  D.E. 48 (Defendant's Exhibit 1).  At the end of the video L.R. got teary and wanted to say that Mr. Stubbs is a "good guy."  D.E. 48 (Defendant's Exhibit 1).  At the June 8, 2016 motion for new trial hearing Ms. Lake stated regarding this video:

> Ms. Lake:    However, that video recantation has never been provided to the State; hasn't been filed as part of the Defense's motion; hasn't been summarized in any detail.  We don't know, what, if anything, it includes or how it could be authenticated.    We don't have any information really regarding the contents of that video recantation.

ECF 16-13, at 6.[4]

On October 22, 2015, the day after Mr. Stubbs' arrest, Ms. Lopez posted to Facebook, "Yay I'm single thank god hell its worth it I don't give a dam."  ECF 16-5, at 59.  In an April 27, 2016 email, Ms. Lake wrote that Ms. Lopez admitted to making that Facebook post which Ms. Lake received from defense counsel. ECF 16-6, at 18.

### 4.    The Days After Mr. Stubb's Release on Deferred Adjudication

---

[4] Clearly Mr. Pretzer had not discussed the video recantation with Ms. Lake.

On April 13, 2016, six days after the guilty plea, Mr. Stubbs signed an order with the conditions of his supervision which included a heading entitled "SEX OFFENDER SPECIAL CONDITIONS" which included 36 subparagraphs detailing conditions related to sex offender restrictions. ECF 16-5, at 11. Two days after signing the conditions of his supervision, on April 15, 2016, Mr. Stubbs was arrested again in relation to allegations of violating the conditions of supervision. ECF 16-5, at 32. The State filed a motion to revoke probation against Mr. Stubbs alleging substantive offense of the unlawful possession of a firearm by a felon, as well as, technical violations of possessing a firearm, and being present at the residence of the L.R. ECF 16-5, at 36.

### 5.    The First DPS Laboratory Report

Then on May 2, 2016, the Texas Department of Public Safety (DPS) issued a forensic biology report analyzing the items submitted from the SANE exam. ECF 16-15, at 158. This report shows no semen detected on any of the items tested, including 10 swabs of the vaginal area. ECF 16-15, at 158.

### 6.    The Revocation Proceedings

On May 4, 2016, the trial court held a contested revocation hearing and Mr. Stubbs was represented by new counsel, Donald Edwards (Mr. Edwards). The State abandoned the unlawful possession of a firearm by a felon allegation in the motion to revoke, Mr. Stubbs pled not true to the remaining allegations, and the State put on its evidence. ECF 16-11, at 5, 7. The State's evidence included

testimony that on April 15, 2016, a police officer searched the residence of Mr. Stubbs where six adults where living and discovered a rifle on a shelf in a closet in the room that Mr. Stubbs shared with another individual.  ECF 16-11, at 14, 15, 17. On April 13, 2016 (the same day Mr. Stubbs signed his conditions of supervision) a CPS officer arrived at a new residence where L.R.'s mother was staying with her new boyfriend (not Mr. Stubbs) and observed Mr. Stubbs at the residence.  ECF 16-11, at 48, 58, 62.    Ms. Lopez told the CPS officer that Mr. Stubbs was at the residence because Ms. Lopez invited him to the residence in order to return some compact disks to her.  ECF 16-11, at 51.  The States also played recordings of jail calls between Mr. Stubbs and Ms. Lopez after his April 15, 2016 arrest.   ECF 16-11, at 55.    As a result of these violations the Nueces County Probation Department recommended a 90-day jail sanction and a zero tolerance policy on supervision for Mr. Stubbs.  ECF 16-11, at 66.  Mr. Stubbs presented the testimony of his niece that the rifle found in the closet belong to her boyfriend who also lived in the trailer house where Mr. Stubbs was sharing a room.  ECF 16-11, at 73.  Mr. Stubbs testified that L.R.'s mother called Mr. Stubbs and wanted him to bring compact disks to her at her new boyfriend's residence.   ECF 16-11, at 89.   Mr. Stubbs did not know that Ms. Lopez or anyone else in her family lived at the boyfriend's residence and that he did not encounter anyone related to L.R. at the residence.  ECF 16-11, at 90.   Mr. Stubbs also testified that he did not know that the rifle was in the closet and that he spent very little time in the room during the

few days he was staying there after being released from jail.  ECF 16-11, at 92,
100.  The trial court found the allegation in the motion to revoke true, revoked Mr.
Stubb's deferred adjudication probation and reset the case for punishment at a later
date.  ECF 16-11, 112.

At the May 6, 2016 punishment hearing, Mr. Stubbs 'mother testified that
Mr. Stubbs has "mild dyslexia, geneo chorea (sic), astigmatism, mild cerebral
palsy" and "[h]e was special ed from the time he was in first grade."  ECF 16-12,
10.  However, his niece testified that she did not believe Mr. Stubbs to be mentally
or physically impaired in any way.  ECF 16-12, at 23.  The trail court sentenced
Mr. Stubbs to concurrent 18-year prison sentences.  ECF 16-12, at 36.

### 7.    The Second DPS Laboratory Report

On June 1, 2016, DPS issued its second lab report find that none of Mr.
Stubbs DNA was found on any of the swabs of L.R.'s vaginal and anal area.  ECF
16-15, at 173.

### 8.    The Motion for New Trial

On May 9, 2016, Mr. Stubbs, through counsel, filed a motion for new trial
based on newly discovered evidence (a Facebook post by L.R.'s mother, a May 2,
2016 forensic report showing no semen, and a video of L.R. recanting the outcry).
ECF 16-5, at 59.  Further, Mr. Stubbs argued that his plea was not knowing and
voluntary because he was not correctly admonished regarding the sex offender
registration and deferred adjudication probation, that he was not allowed to read

the recantation letter or informed of the lack of semen on swabs from L.R. prior to the plea. ECF 16-5, at 60. As well, Mr. Stubbs raised an ineffective assistance of counsel claim with respect to his decision to plead guilty. ECF 16-5, at 60. Specifically, Mr. Stubbs argued that his trial counsel failed to properly review discovery, explain rights prior to the plea, failed to explain the consequences of the plea and the range of punishment upon revocation, "failed to discuss with the fact that an injury and semen were noted on the alleged victim in an area in which she did not claim the defendant touched her and swabs were not taken from that area," misinformed him regarding the length of sex offender registration, and failed to play for Mr. Stubbs L.R.'s video recantation. ECF 16-5, at 60-62. Attached to the motion for new trial was an affidavit of Mr. Stubbs. ECF 16-5, at 65, 66. In the affidavit Mr. Stubbs states that the time he entered his plea that he was not aware that "the forensic examination failed to show any presence of semen on the alleged victim" and that he was misinformed that the sex offender registration would only last the duration of this probation. ECF 16-5, at 65. Further, Mr. Stubbs stated that his trial counsel, Mr. Pretzer, did not review the evidence with him in detail, particularly the evidence relating to L.R.'s recantation. The affidavit states also that Mr. Pretzer met with him "perhaps 4 times" from his arrest to the plea date. He went over the admonishments in just a few minutes before he pleaded guilty and that on the date of the plea Mr. Pretzer told Mr. Stubbs that the L.R.'s video recantation was irrelevant or inadmissible. ECF 16-5, at 66. Mr. Stubbs stated that

Mr. Pretzer told him his options were to spend around 8 years in prison or take deferred adjudication probation, and that he did not understand how deferred adjudication operated.  ECF 16-5, at 66.  The affidavit goes on to explain that Mr. Stubbs would have not pleaded guilty and would have insisted on a trial:

> Had I known
> 1) there were discrepancies in the physical evidence regarding [L.R.] showing trauma in an area in which she had not made an allegation against me about making contact as well as conflicts between the forensic exam showing no semen in areas [L.R.] claimed I contacted her with my penis but a medical report showing semen in an area she did not claim I contacted;
> 2) [L.R.] made a full recantation in writing on January 26, 2016, with an explanation about her desire to separate me from her mother;
> 3) [L.R.'s mother] celebrated my arrest on Facebook the day after I was arrested; and
> 4) I would be required to register as a sex offender for life; then I would not have pleaded guilty but insisted on trial.

ECF 16-5, at 66.

On June 8, 2016, the trial court held a hearing on Mr. Stubbs' motion for new trial with new counsel, attorney John Lamerson (Mr. Lamerson).   At the hearing, State informed the trial court that the State had on the same day as the hearing received the DPS DNA forensic report.  ECF 16-13, at 13.  Mr. Stubbs testified during the hearing and reiterated what he wrote in his affidavit.   ECF 16-13, at 40-57.

Mr. Stubbs testified that Mr. Pretzer never showed him any discovery except for pressing a paper up against the glass at the jail.  ECF 16-13, at 41.  He stated that Mr. Pretzer visited with him 5 times, maximum, for 5 to 10 minutes per visit.

ECF 16-13, at 41, 45-46.  Mr. Stubbs testified that he met with Mr. Pretzer roughly

50 to 75 minutes during his entire incarceration.  ECF 16-13, at 46.  With respect to

the inmate correspondence Mr. Stubbs had sent to the trial court, he said the

following:

> Mr. Stubbs:  Yes, I had wrote the Judge about 140 something days in,
>
> stating that he wasn't doing his job.  He wasn't answering my family
>
> [sic.] calls.  He wasn't answering my phone calls.  He was not doing
>
> nothing.  And I was trying to get pretrial probation or a bond hearing
>
> or something.   Because at 145 days something should have already
>
> happened and I was still waiting on Mr. Pretzer to do something and
>
> he clearly wasn't.  And somebody from the Court wrote a response to
>
> him, "Randy, go se him ASAP."
>
> Mr. Lamerson:      Had Randy actually seen you before that?
>
> Mr. Stubbs:  I think that was the last time that I saw him.  Was when
>
> he got that answer - response back.

ECF 16-13, at 63-64.  Ms. Caley gave Mr. Pretzer two copies of the recantation

video probably a month before trial.  ECF 16-13, at 43.  Mr. Pretzer was given two

copies because he lost the original copy of the recantation video.  ECF 16-13, at

50.   Mr. Pretzer did not discuss the recantation video with Mr. Stubbs until he

received the second copy of the video on the day of his guilty plea.  ECF 16-13, at

53.  Mr. Stubbs had heard about the recantation video prior to the plea in speaking

with his niece, Ms. Caley.  ECF 16-13, at 54.   Mr. Pretzer would not answer phone calls from Mr. Stubbs and his family and would not return calls.  ECF 16-13, at 55. Ms. Caley testified during the hearing that she would call Mr. Pretzer "like five times a day,  would leave voice mails, never got any response."  ECF 16-13, at 68. Ms. Caley was working as a de facto investigator and had video recorded her interview with L.R.  ECF 16-13, at 69.

> Ms. Caley:   Yeah, I wanted to show him the video later on and when I came across it and then I wanted to show him the actual statement she printed out, but I never got a chance to.

ECF 16-13, at 69.

Regarding the sex offender registration, Mr. Pretzer told Mr. Stubbs only that he would have to register during the period of his probation.  ECF 16-13, at 44.   Mr. Pretzer did not go over the recantation with Mr. Stubbs other than that there was a recantation.   ECF 16-13, at 45.   Mr. Stubbs testified that Mr. Pretzer hardly spoke to him regarding the DNA and the status of the results.  ECF 16-13, at 45. During the hearing Mr. Stubbs stated his belief that the report showed the DNA came from another donor.  ECF 16-13, at 45.

> Mr. Stubbs:   It did say I was exonerated or…

ECF 16-13, at 45.  Mr. Stubbs learned that there was going to be a plea on the day he pled guilty when Mr. Pretzer spoke to him in the jury room that the State was offering 8 years' incarceration or 10 years probation.   ECF 16-13, at 45.   Mr.

Pretzer did not want to take the case to trial.  ECF 16-13, at 66.  Mr. Pretzer rushed

Mr. Stubbs thought the plea admonishment paperwork.   ECF 16-13, at 64.

Regarding the filling out of the plea admonishments:

> Mr. Stubbs: He went down the list and put an "x" and said initial
> everywhere there is an "x."
>
> Mr. Lamerson:     Did he actually read it out to you or go through it
> with you?
>
> Mr. Stubbs: Not in its entirety, no.
>
> Mr. Lamerson:     How much do you think he went though with you?
> What percent?
>
> Mr. Stubbs:  Maybe a quarter of it.
>
> Mr. Lamerson:     The rest of it he just said initial here, sign here?
>
> Mr. Stubbs:  Yes.

 ECF 16-13, at 49.   The plea admonishments indeed show hand written "x's"

throughout corroborating Mr. Stubbs' testimony.    16-3, at 2-11.   Mr. Stubbs

believed that he would only have to register as a sex offender during the period of

his probation.  ECF 16-13, at 44.  Mr. Pretzer did not explain the significance of

deferred adjudication.   ECF 16-13, at 47.   Mr. Stubbs testified regarding his

decision the day of the guilty plea:

> Mr. Lamerson:     Do you recall the Court asking you about your
> representation by Mr. Pretzer?

Mr. Stubbs:  Yes.

Mr. Lamerson:      Do you recall telling the Court anything to indicate
that you were not satisfied?

Mr. Stubbs:  At that point, I just wanted it over.  And I thought I could
get back to my life by accepting this probation and I was terribly
wrong in that fact.

ECF 16-13, at 58.

Regarding Mr. Stubbs' desired outcome before the plea, he testified that
what he wanted was "pretrial probation," to get out on bond.  ECF 16-13, at 66.

Ms. Lake:   When you make the guilty plea, were you under the
impression that you were getting out on a pretrial probation and not
pleading guilty?

Mr. Stubbs:  No.   At that point, I was fed up with being in jail for
something I didn't do.  I wanted my freedom back and my life back.
With y'all offering the eight years, he said that was the best it was
going to get.

ECF 16-13, at 66.

Mr. Pretzer also testified at the motion for new trial that was resumed on
June 20, 2016.  ECF 16-14, at 5.  Mr. Pretzer estimated he met with Mr. Stubbs 4 -
5 times for 30 minutes to one hour per visit to give Mr. Stubbs status, inform him

about various defenses, that to tell him they had not gotten the indictment or discovery. ECF 16-14, at 5.

> Mr. Lamerson:      How many times in your estimation did you visit with Mr. Stubbs?
>
> Mr. Pretzer: Probably four, maybe five.
>
> Mr. Lamerson:      And about how long each time when you met him — or you met him in the jail, correct?
>
> Mr. Pretzer: Yeah, we talked extensively in the jail, and then I would come back and give him some status and talk to him about various defenses and the him that we haven't gotten an indictment yet and I don't have discovery, and so for and so on.
>
> Mr. Lamerson:      About how long you said about four times, about how long did you meet with him each time?
>
> Mr. Prezter: I would estimate between 30 minutes, maybe an hour.

ECF 16-14, at 5.

> Mr. Pretzer: And I think there were other times, too.  I didn't keep real tight notes on that… .   So I aways tried to hell him: "I don't have discovery," this is the first thing I say.  "The State doesn't have a file.  I don't have a file.  When I have something to tell you, I'll come over here and we'll talk about it."

ECF 16-14, at 6.   Prior to the indictment Mr. Pretzer testified that he had filed "motions" to reduce bond and that he thought they had several hearings on that. ECF 16-14, at 6.  The trial courts docket reflects no bond hearings prior to the only one on March 21, 2016.  ECF 16-6, at 81.  Then Mr. Pretzer testified that he visited with Mr. Stubbs 3 or 4 times after receiving discovery, "two or three times before indictment" and stated that he does not talk about cases over the phone.   ECF 16-14, at 8.  Mr. Pretzer stated that he conveyed the plea offer to Mr. Stubbs 2 to 3 weeks prior to the plea.  ECF 16-14, at 9.  Mr. Pretzer testified that he went over the discovery with Mr. Stubbs "several times."  ECF 16-14, at 7.

> Mr. Lamerson:      You said you visited him three to four times total, correct?
>
> Mr. Pretzer: No, it was more than that, because there was some times before the indictment, I think two or three times before the indictment. Because, you know, we'd get a call from the phone, what's going on, and I'd go over and see him and worked him into my schedule.  And, afterwards when we were in the negotiations with the State there were more times, yeah.

ECF 16-14, at 9.   Later Mr. Prezter stated that he could have visited Mr. Stubbs for a five to ten minute period.  ECF 16-14, at 29.

> Mr. Pretzer testified about "red flags" in the discovery regarding Mr. Stubbs' sexual misconduct and referred to a previous outcry made against Mr. Stubbs by

L.R.  ECF 16-14, at 10.  When Mr. Pretzer was asked about whether the family had provided him with exculpatory social media posts, Mr. Pretzer responded that the family should have shown that evidence to the State.   ECF 16-14, at 12.   Mr. Pretzer said he only spoke to the mother and niece of Mr. Stubbs for 10-15 minutes.  ECF 16-14, at 13.  At this, the mother, who was present at the hearing, shook her head obviously disapprovingly, to which Mr. Pretzer testified that he wished they would leave.  ECF 16-14, at 13.

> Mr. Lamerson:     To your knowledge, did Mr. Stubbs every send any correspondence to the court that you weren't visiting him enough?
>
> Mr. Pretzer: Well, if he had, I hadn't seen it.  And as I explain to my clients since I have quite a few cases that if I have something to say I'l come by, I'm not going to hold you hand all the time.  And I try to do that even with paying clients.
>
> Mr. Lamerson:     Did this court ever order you to go see Mr. Stubbs?
>
> Mr. Pretzer: Not that I know of.
>
> Mr. Lamerson:     Well, who else would know besides you?
>
> Mr. Pretzer: I don't remember.  I don't remember having that kind of problem.  The problem we had was getting the bond hearing set.  But then the plea came in, the offer came in, and then the bond sort of went to the side.

ECF 16-14, at 17.    With respect to the sex offender registration, Mr. Pretzer explained that there is a procedure after the probation is complete, "something like a risk management, risk assessment, and try to get off the registration."   ECF 16-14, at 15.  Regarding the DNA evidence that had not come in prior to the plea, Mr. Pretzer testified what he told Mr. Stubbs.  ECF 16-14, at 23.

> Mr. Pretzer: Yeah.   I'm trying to remember, because we went back and forth on that.  And I can  just give you what I probably said, if you want me to really say in fact I said it or not, but if it came back negative, its would show possibly that the child may have been promiscuous and that could be a double-edged sword and swing on him, because that's also take advantage of someone who was promiscuous.   So no matter where you turn, it's like a minefield.
>
> You've got to be careful or you're going to step and blow your leg off.

ECF 16-14, at 23.  Mr. Prezter also stated that Mr. Stubbs was pushing for a plea and that he spoke about probation from the beginning.  ECF 16-14, at 23, 35.

> Mr. Pretzer: No, he was pushing for a plea.  And then he spoke about probation from the beginning.  And again I admonished him, I'm not going to get into that until I looked at discovery, talked with the prosecutor, talked with him, and several other matters.

ECF 16-14, at 23.

> Ms. Lake:    And he was actively pressing you to get an offer?

Mr. Pretzer:  Yes, he was.

Ms. Lake:     Was there a particular type of offer that he wanted?

Mr. Pretzer:  Probation. …. He discussed it with me the first time I met him.

ECF 16-14, at 35.  On June 21, 2016 the trial court denied the motion for new trial by written order without analysis.  ECF 16-6, at 79.

### 9.     The Direct Appeal

Mr. Stubbs, though counsel, filed a direct appeal to the 13th Court of Appeals of Texas again represented by Mr. Lamerson.   On appeal Mr. Stubbs raised two primary points of error, the ineffective assistance of his trial counsel resulting in an unknowing and involuntary plea, and the trial court's error in denying his motion for new trial.  ECF 16-16, at 4.  Specifically, Mr. Stubbs argued that Mr. Pretzer did not adequately investigate the case or confer with Mr. Stubbs, did not explain the importance of the DNA evidence, did not investigate Facebook posts by L.R.'s mother, did not allow Mr. Stubbs to review L.R.'s recantation prior to pleading guilty, did not adequately explain the nature of the plea bargain and deferred adjudication.  ECF 16-16, at 14-27.

The 13th Court of Appeals of Texas (COA) affirmed the trial court's denial of Mr. Stubbs' claims in his motion for new trial and the alleged ineffective assistance of counsel.  ECF 16-19, at 1.  The COA dismissed Mr. Stubbs claims of ineffective assistance of counsel "as reasonable credibility determinations that the

trial court resolved in favor of the State," and flaws there may have been in trial counsel's representation did not rise to the level of ineffective assistance of counsel.  ECF 16-19, at 15-18.  As for the alleged error in denying the motion for new trial the COA affirmed the trial court and opined that the alleged newly discovered evidence did not meet the definition of "newly discovered evidence" because it either was known to Mr. Stubbs prior to his plea of guilty (the video recantation), Mr. Stubbs was not diligent in discovering the new evidence (DNA analysis/results) because Mr. Stubbs decided to accept "the probabilities of his proverbial roll of the dice," or the newly discovered evidence would not have "'materially altered the outcome of the trial had it been made available'" (Facebook post).  ECF 16-19, at 21-22.

### 10.    The Petition for Discretionary Review

Mr. Stubbs, through appellate counsel, Mr. Lamerson, filed a petition for discretionary review (PDR) with the Court of Criminal Appeals of Texas (CCA) which was denied.  ECF 16-31, at 141.  Mr. Lamerson's PDR raised the following issues: ineffective assistance of counsel and that the trial court abused its discretion in denying a new trial.  ECF 16-26, at 3.  Specifically, Mr. Pretzer did not allow Mr. Stubbs to view the video recantation and advised the DNA results would do harm no matter the results.  ECF 16-26, at 14.  Mr. Pretzer did not adequately: confer with Mr. Stubbs, prepare the defense, investigate the facts and exculpatory evidence, or explain the plea bargain offer, that the result of the proceedings would

have been different but for Mr. Pretzer's ineffective assistance of counsel, and that

Mr. Stubbs would not have pled guilty.  ECF 16-26, at 17, 21, 23.  The CCA denied

his petition for discretionary review without written findings.

### 11.    The State Writ of Habeas Corpus

Mr. Stubbs, *pro se*, filed a writ of habeas corpus in October 2016 which was

dismissed because he filed it too early, before the mandate from the COA issued.

ECF 16-27, at 1.  Then, Mr. Stubbs, again *pro se*, filed his second, timely writ of

habeas corpus with the CCA in April 2018.  ECF 16-31.  Here Mr. Stubbs raises

following claims: actual innocence, ineffective assistance of counsel and as a result

his plea was not knowing or voluntary, there was insufficient evidence to support

his guilt, a Brady violation alleging the State's failure to disclose exculpatory DNA

analysis/reports, double jeopardy, and excessive bail.  ECF 16-31, at 8, 10, 11, 12,

14, 15, 24, 26, 29, 34.  Specifically regarding his ineffective assistance of counsel

claim he argued: failure to adequately investigate, failure to adequately explain the

plea agreement and the consequences of the plea, provided misleading advice

regarding the DNA evidence, used coercion and scare tactics to get a plea deal

signed, did not adequately review the evidence with him, and failure to seek

modification of bail, that Mr. Pretzer was wrong about the sex offender registration

requirements.  ECF 16-31, (generally).    Mr. Stubbs argued that is plea was not

knowing and voluntary, that the plea paperwork was defective and counsel did not

adequately review it with him and mislead him regarding the consequences of the

plea and the nature of the evidence.  ECF 16-31, at 13, 25.  He further argued that
he would not have pled guilty but for his lawyers ineffective assistance of counsel.
ECF 16-31, at 23.  Essentially, in the 36 pages of Mr. Stubbs' pro se writ habeas
corpus, Mr. Stubbs raised at least the issues raised in the instant amended response.
ECF 16-31, at 1-36.

In response to Mr. Stubbs' writ of habeas corpus, the trial court issued its
findings of fact, conclusions of law, recommendation and order.  ECF 16-31, at
142.  The trial court found there was no necessity for an evidentiary hearing and
laid out its findings and conclusions.  ECF 16-31, at 142.  The trial found the
evidence does not affirmatively show Mr. Stubbs' innocence, that counsel was not
ineffective and that his plea was not involuntary, that there was sufficient evidence
to support his conviction, that Mr. Stubbs failed to show prosecutorial misconduct
because he waived the error by failing to object in the trial court and raise the issue
on appeal, that the plea paperwork was not defective for failure to preserve the
issue and that he pled guilty to the three correct counts in the indictment, there is
no double jeopardy violation apparent on the record, and Mr. Stubbs' excessive bail
claim is not a a claim for which habeas relief may be granted.  ECF 16-31, at
142-143.  The trial court's findings of fact failed to address many of Mr. Stubbs'
claims.  The CCA denied Mr. Stubbs' writ of habeas corpus based on the findings
of the trial court.  ECF 16-29.

Subsequent the CCA denial of the writ, Mr. Stubbs appealed again to the CCA reiterating his previous claims.  See, ECF 16-30, at 1-9.

### 12.   The Instant Federal Writ of Habeas Corpus, 28 U.S.C. § 2254

Next, Mr. Stubbs filed the instant writ of habeas corpus, via 28 U.S.C. § 2254 (the instant petition).   D.E. 1.   Mr. Stubbs specifically incorporates the copious issues and arguments he raised in this State writ of habeas corpus.  D.E. 1, at 6, 8. Mr. Stubbs goes on to raise claims of: actual innocence, Fifth, Sixth and Fourteenth Amendment due process violations, ineffective assistance of counsel resulting in an unknowing and involuntary plea, insufficient evidence to support a finding of guilt, that he did not receive a fair trial, and Mr. Stubbs expresses his desire for reversal and a jury trial.  D.E. 1,. At 6-7.  The trial court erred in denying his motion for new trial, actual innocence, no factual innocence, constitutional violations, defective plea, double jeopardy, ineffective assistance of counsel are other issues Mr. Stubbs reiterates in the instant petition.  D.E. 1, 11-21 (generally).

### 13.   The State's Motion for Summary Judgment

The State makes no issue of procedural default, exhaustion or statute of limitations with respect to Mr. Stubbs' claims in the instant petition.  D.E. 20, at 4. The State boils down Mr. Stubbs' claims to four: (1) actual innocence, (2) ineffective assistance of counsel due to Mr. Pretzer's failure to explain deferred adjudication and that DNA results would not be helpful, (3) no factual evince to

support his conviction, (4) and a second ineffective assistance of counsel claim that Mr. Pretzer "failed to correct the State's use of false evidence of 'sperm found.'" D.E. 20, at 2.  The State denies these four assertions and argues that his claims fail since he has failed to demonstrate the trial courts decision was contrary to or invoked the unreasonable application of federal law, or was based upon an unreasonable determination in light of the facts presented.  D.E. 20, at 2.

The State argues Mr. Stubbs' first claim, actual innocence, is no cognizable via the writ of habeas corpus because he "has not shown an independent constitutional violation."   D.E. 20, at 8.   Essentially, the State relates that Mr. Stubbs' claim of innocence is based on the victim's "inherently suspect" recantation, "his own factual claims that the complainant recanted several times" and exculpatory DNA evidence.  D.E. 20, at 9.  The State argues that Mr. Stubbs failed to rebut the CCA's presumed correct denial of this claim and that he failed to show "'it is more likely than not that no reasonable juror would have convicted him.'"  D.E. 20, at 8-9.

As for Mr. Stubbs' third and fourth claims, the State writes that because Mr. Stubb's plea was knowing and voluntary, he has waived his third and fourth claims. D.E. 20, at 10.   Because a defendant need not be informed of all the possible collateral consequences of a plea, and the fact that Mr. Stubbs signed the plea admonishment paperwork and gave the appropriate answers during the plea colloquy, the State argues his plea was knowing and voluntary.  D.E. 20, at 12.

Mr. Stubbs' second claim fails as well, says the State, again because a voluntary plea waives Mr. Stubbs' ineffective assistance of counsel claims. D.E. 20, at 17. Further the State argues that Mr. Stubbs claim does not violate the Strickland standard by reiterating the opinion of the COA in Mr. Stubbs' direct appeal. D.E. 20, at 19.

Mr. Stubbs also filed a *pro se* response to the State's motion for summary judgment.

## II. The State's Motion for Summary Judgment Fails and Mr. Stubbs Case Merits Relief.

The state's motion for summary judgment fails because there is genuine issue as to material facts in Mr. Stubbs' case and the State is not entitled to judgment as a matter of law. See, Fed. R. Civ. P. 56. Even if the Court decides the State has presented a properly supported motion for summary judgment, Mr. Stubbs herein proves the requisite significant probative evidence of a genuine issue of material fact. See, Hamilton v. Segue Software, Inc., 232 F.ed 473, 477 (5th Cir. 2000). Mr. Stubbs rebuts by clear and convincing evidence the correctness of the state courts' factual findings. See, Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002).

### A. Ineffective Assistance of Counsel

Mr. Stubbs demonstrates that there is a reasonable probability that, but for Mr. Pretzer's acts and omissions, Mr. Stubbs would not have pleaded guilty and

would have insisted on going to trial.   See, Hill v. Lockhart, 474 U.S. 52, 98 (1985).   As laid out below, Mr. Pretzer's specific acts or omissions, and the accumulation of them, that were the result of unreasonable professional judgment. Strickland v. Washington, 466 U.S. 668, 690 (1984).   Mr. Pretzer's work on Mr. Stubbs' case was incompetent under "prevailing professional norms."   Id.  Further, the state courts' application of the Strickland standard to the facts of Mr. Stubbs' case and Mr. Pretzer's behavior was unreasonable.   See, Harrington v. Richter, 562 U.S. 86, 101 (2011).   In light of Mr. Stubbs' case, no "fair-minded jurist could agree" that the State court's decision on Mr. Pretzer's performance was correct.   Id. An appropriately thorough look at Mr. Stubbs' claims demonstrates a reasonable probability that, but for Mr. Pretzer's errors, Mr. Stubbs would not have pleaded guilty and would have pressed on seeking release on bond and ultimately elected to try his case to a jury.  See, Hill, 474 U.S. at 58-59.

**1.     The State Courts Were Clearly and Convincingly Incorrect in Giving Mr. Prezter's Testimony the Weight to Counter-Balance and Refute Mr. Stubbs' Claim of Substandard Performance.**

Mr. Prezter's testimony at the motion for new trial hearing regarding his performance representing Mr. Stubbs was unclear, inconsistent, and contrary to the evidence.   Meanwhile Mr. Stubbs' testimony during the motion for new trial hearing was straight-forward, consistent, and corroborated by the evidence.   The state's reliance on Mr. Pretzer's specious testimony at the motion for new trial

hearing as a counterweight to Mr. Stubbs' allegations of ineffective assistance of counsel was clearly and convincingly incorrect and, under the circumstances, unreasonable.

Mr. Stubbs was reticent that Mr. Pretzer visited with him "perhaps four times" and five times, maximum for five to ten minutes per visit. See, *supra*. Mr. Prezter did not review discovery with him, did not receive or return calls from him or his niece who was working as the de facto investigator. See, *supra*. This is corroborated by his two inmate correspondence forms, as well as, Ms. Caley's testimony. See, *supra*, *infra*. Mr. Stubbs said he was desperate for bond, he first spoke to Mr. Pretzer about the plea offer on the day of the plea, and Mr. Pretzer rushed him through the plea admonishments without an adequate explanation of consequences of the plea. See, *supra*. The plea admonishments show the "x's" where to sign, evidence of rushed work, and the timeline of events coupled with Mr. Pretzer's own testimony further corroborates Mr. Stubbs' testimony. See, *supra*, *infra*.

Mr. Prezter's testimony regarding the the timing and amount of time he spent conferring with Mr. Stubbs was uncertain, and unbelievable in light of the record. Mr. Prezter testified he met with Mr. Stubbs "four, maybe five" times and for 30 minutes to an hour each time. See, *supra*. Then Mr. Pretzer stated there may have been other times and stated he may have made five to seven visits, and there may have been a five to ten minute period. See, *supra*. Mr. Prezter's

testimony conveys an implausible, broad spectrum of time spent with Mr. Stubbs: anywhere from two to seven hours.   Mr. Pretzer testified that during this pre-indictment period he filed "motions" to reduce bond and they had several hearings on that.  See, *supra*.  However, the record proves that he filed only one motion and there was only one hearing that had any semblance of a bond hearing, months *after* indictment.  See, *supra*.

Mr. Pretzer stated he talked "extensively" in the jail with Mr. Stubbs but practically in the same breath he stated that he would tell Mr. Stubbs that he did not have the discovery and that "I always tried to tell him… 'When I have something to tell you, I'll come over here and we'll talk about it.'"  See, *supra*.   Two to three weeks prior to the guilty plea he conveyed the offer to Mr. Stubbs, says Mr. Pretzer.  See, *supra*.   But, that would have been right around the time of the March 21 hearing where Ms. Lake announced that Mr. Pretzer had requested an offer and Mr. Stubbs had still not received the indictment, again almost two months after the grand jury indicted him, one month after the February 22 arraignment, and Mr. Pretzer assured the trial court that "I will go over it with him."  See, *supra*.  On March 21, no one had spoken to the L.R., Mr. Pretzer had not reviewed the indictment with Mr. Stubbs, there was no mention of the video recantation, Facebook post, and the trial court seemed genuinely concerned about "getting to the bottom" of the DNA   evidence and what L.R.'s wildly conflicting stories meant.  See, *supra*.  This, along with Mr. Stubbs' February 15 and March 1 inmate

correspondence forms to the trial court, makes it clear Mr. Pretzer had not reviewed any discovery with Mr. Stubbs by March 21.  See, *supra*.

With this in mind, we should return to Mr. Pretzer's testimony that the only problem with Mr. Stubbs' case was getting the bond hearing set:

> Mr. Pretzer: … I don't remember having that kind of problem.   The
>
> problem we had was getting the bond hearing set.   But then the plea
>
> came in, the offer came in, and then the bond sort of went to the side.

See, *supra*.  It took Mr. Pretzer from October 26, 2015 to March 17, 2016 to file a motion for bond reduction and to have a bond hearing on the already scheduled March 21 pretrial hearing.  The problem Mr. Pretzer refers to here in actuality was his own unwillingness or inability to file a simple motion for bail reduction.  This is also significant because it discredits Mr. Pretzer's testimony that Mr. Stubbs was actively "pushing for a plea" and "probation from the beginning," the first time Mr. Pretzer met him.  See, *supra*.  No, Mr. Stubbs was pushing for bond — as he told the court in his two desperate inmate correspondence forms.

On the date of Mr. Stubbs' long-awaited bond hearing, Mr. Pretzer, after a perfunctory examination of Mr. Stubbs regarding his bond suitability and *sua sponte* requesting to end the hearing, was requesting an offer from the State.  See, *supra*.  Right around the time of this hearing, Mr. Pretzer says he got the offer Mr. Pretzer was seeking — and Mr. Stubbs' hopes for bond reduction — and his defense —  "sort of went to the side."   Mr. Pretzer was not even aware that Mr.

Stubbs had sent the two desperate pleas for help to the trial court, despite the fact that the trial court appears to have sent at least one of the correspondence forms with a note to Mr. Pretzer to visit with Mr. Stubbs.  See, *supra*.

"'When I have something to tell you, I'll come over here and we'll talk about it,'" see, *supra*, clearly then, Mr. Pretzer would not have had "something" to talk to Mr. Stubbs about until after the March 21 hearing.  However, talking with Mr. Stubbs about his defense, reviewing the discovery with him, getting Mr. Stubbs released so he could defend himself from the outside, would have gone "to the side" according to Mr. Pretzer once he got the State's offer — right around March 21.  According to Mr. Pretzer then, Mr. Stubbs' desperate hopes for a bond reduction "went to the side" around a time when Mr. Stubbs had not even reviewed the charging instrument, much less the discovery, and in the face of: "medical findings" inconsistent with the outcry,  L.R.'s inconsistent renditions of the manner in which the assault occurred, two written recantations and a video recantation, two previous unfounded outcries of sexual abuse spoken by L.R., one against Mr. Stubbs when he may have been in Wisconsin, Ms. Lopez's statement that L.R. was lying about the abuse and had lied about it before, L.R. and outcry witness L.F., and other alleged outcry witnesses, evidently left uninterviewed, a Facebook post of significant impeachment value, pending potentially, and in the end actually, exculpatory DNA laboratory results when "the proof is right there in the swabs" according to Mr. Stubbs.

Mr. Pretzer's explanation of the potentialities of the pending DNA results were categorized as "unartful" by the COA.  However, in light of the totality of the circumstances at the time, Mr. Pretzer's explanation to Mr. Stubbs was that the DNA results would be unfavorable to Mr. Stubbs' case no matter what.   The outcome of the DNA tests was a "double-edged sword" and that somehow waiting for the results was like a minefield likely "to blow your leg off."  <u>See</u>, *supra*.   In hindsight we know that Mr. Pretzer was wrong about his advice because the DNA evidence came back favorable and exculpatory.  But, even at the time, what was being tested was not only whether Mr. Stubbs DNA would be found on the 14 swabs but, whether semen was actually discovered.  What if there was no semen found *and* no DNA from Mr. Stubbs?  How could that possibility have any sort of "double-edged sword — blow your leg off" quality to it?  After all, Mr. Stubbs' statement likely to have been presented at trial was "the proof is right there in the swabs."  <u>See</u>, supra.    Here again, Mr. Pretzer's substandard description of the significance of the DNA further corroborates Mr. Stubbs' claims of his hopelessness while languishing in jail under the inactivity and fatalistic advice of Mr. Pretzer.

Mr. Pretzer's testimony was generally correct regarding his explanation of the sex offender requirements, i.e. that Mr. Stubbs' deferred adjudication subjected him to life-long sex offender registration, <u>see</u>, Tex. Crim. Proc. art. 62.101(a)(1), and that there exists a procedure by which a person can motion the trial court for

early termination of the obligation to register if they have an individual risk assessment.  See, Tex. Crim. Proc. art. 62.404.  However, there are two important things here: (1) what Mr. Stubbs understood in Mr. Pretzer's explanation and (2) whether Mr. Pretzer was correct in describing the sex offender deregistration law. Mr. Petzer's performance failed on both.  Mr. Stubbs claims and testified that he understood Mr. Pretzer to mean that he positively would be able deregister as a sex offender upon completion of his probation.  See, *supra*.  However, the more disillusioning reality of Mr. Prezter's performance is that Mr. Stubbs will never be able to seek deregistration because Texas precludes those convicted under Tex. Pen. Code Sec. 22.011 from deregistration because the Texas's lifetime registration requirement does not exceed the federal (under SORNA) lifetime registration obligation.  See,  Deregistration Step-by-Step Guide, Texas Dept. of Health and Human Services,     https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/licensing-credentialing-regulation/csot/csot-deregistration-step-by-step.pdf; see also, Ex parte Chamberlain, 352 S.W.3d 121,123 (Tex. App. Forth Worth 2011); TDPS Deregistration Eligibility Chart 07-15-20, Deregister Texas, https://www.deregistertexas.com/wp-content/uploads/2020/07/TDPS-Deregistration-Eligibility-Chart.pdf .  Not only did Mr. Pretzer's explanation of the sex offender registration duties poorly convey Mr. Pretzer's own understanding of the law, Mr. Pretzer's explanation was contrary to the law.

Mr. Pretzer's uncontrovertable acts and omissions are the following: it took him almost six months to file a motion for bail reduction for a man who had been desperate for bond, he did not pay any attention to Mr. Stubbs' inmate correspondence forms and the trial court's suggestion to visit Mr. Stubbs, he ignored Mr. Stubbs' phone calls from the jail, he ignored his niece, Ms. Caley, who was working as the only investigator and had obtained and preserved impactful exculpatory evidence, he never gave the State the video recantation nor had he "summarized in any detail" the video for Ms. Lake, he believed that Mr. Stubbs' family should have given exculpatory evidence directly to the State and not to him, he had not reviewed the indictment with Mr. Stubbs or even provided him with a copy of it after almost two months of indictment, he was seeking an offer before making the opportunity to review discovery with Mr. Stubbs, he was at the very least "unartful" in discussing the potentialities of the DNA results, he believed that once he obtained the offer that Mr. Stubbs' quest for pretrial release was moot, he gave a cursory summary of the plea admonishments including the nature of deferred adjudication, and was dead-wrong regarding Mr. Stubbs' sex offender deregistration possibilities.

All of these factors weight heavily in favor of disregarding Mr. Pretzer's testimony generally, and especially regarding the time he spent with Mr. Stubbs, that he met extensively with him and reviewed the discovery with him several times, and that Mr. Stubbs was wanting to plead guilty to a probation offer the

whole time.     Mr. Stubbs' written pleadings and his testimony during the motion for new trial appears to be unimpeached, his claims have been consistent throughout, and he is the more credible witness regarding the inadequacies of Mr. Pretzer's performance.   Under the circumstances, Mr. Stubbs found himself in an impossible situation.  He wanted bond to fight his case from the outside.  However, with an attorney who was doing "nothing" for him and who had so easily dispensed with the presumption of innocence and his duty as his attorney, after about six months in custody, Mr. Stubbs only perceived recourse was to "get back my life by accepting this probation."

Therefore, the State courts clearly and convincingly were incorrect in their assessment of Mr. Pretzer's credibility to counter-balance Mr. Stubbs' claims that are supported by the record.     Mr. Stubbs has rebutted the presumption of correctness with respect to the State courts' explicit and implicit findings of fact. See, Garcia v. Quarterman, 454 F.3d 441, 444 (5th Cir. 2006).

**2.   The State Courts' Decisions Were Contrary to, or Involved an Unreasonable Application of, Clearly Established Federal Law, and Resulted in a Decision that was Based on an Unreasonable Determination of the Facts in Light of the Evidence.**

The State court's incorrect reliance on Mr. Pretzer's testimony to dismiss Mr. Stubbs' claims and testimony as "reasonable credibility determinations" in favor of the State, allows this Court to consider Mr. Stubbs' unimpeached claims

and testimony in addition to the uncontrovertable acts and omissions stated above. Mr. Pretzer led him to believe he would only have to register for the period of probation.  See, *supra*.   Mr. Pretzer informed Mr. Stubb's of the plea offer on the day of the plea.  See, *supra*.  What Mr. Stubbs wanted throughout his entire pretrial detention was to be released on bond, and not to plead guilty.   See, *supra*.   Mr. Pretzer said that deferred adjudication probation was "as good as it was going to get." See, *supra*. Mr. Pretzer never reviewed the discovery with Mr. Stubbs in any meaningful way.   See, supra.    Mr. Pretzer lost the first copy of the video recantation given to him by Ms. Caley.  See, *supra*.  Mr. Pretzer did not discuss the video recantation until the day of the plea.  See, *supra*.  Mr. Pretzer did not explain the significance of deferred adjudication.  See, *supra*.  Mr. Prezter met with Mr. Stubbs 50 to 75 minutes during the case.  See, *supra*.

In order to prevail on a claim of ineffective assistance of counsel, Mr. Stubbs must show that Mr. Pretzer's performance was deficient.  Strickland, at 687.  Mr. Stubbs must also demonstrate that the deficient performance prejudiced his defense and that Mr. Pretzer's errors were so serious so as to deprive Mr. Stubbs of a fair trial.  Id.   This Strickland analysis applied in the contest of guilty pleas and prejudice is established where there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have instead insisted on going to trial.  Hill v. Lockhart, 474 U.S. 52, 58-59 (1985).

"Reasonableness under prevailing professional norms" is the measure. Strickland, at 694.   The mission of a lawyer for a defendant is vigorous advocacy of the defendant's cause.  Id.  "The performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Strickland, at 694.  The idea is to reconstruct the circumstances from counsels' perspective at the time.   Id.   Counsel must make reasonable investigations unless a reasonable decision was made not to investigate.   Id., at 695.  The ABA Standards are guide to assist the court in determining what is reasonable.  Id.

Current and pertinent ABA Standards for criminal defense attorneys are as follows:

Standard 4-1.3 Continuing Duties of Defense Counsel
(d) a duty to communicate and keep the client informed and advised of significant developments and potential options and outcomes
(e) a duty to be well-informed regarding the legal options and developments that can affect a client's interests during a criminal representation
(f) a duty to continually evaluate the impact that each decision or action may have at later stages, including trial, sentencing, and post-conviction review
(h) a duty to consider the collateral consequences of decisions and actions, including but not limited to the collateral consequences of conviction

Standard 401.9 Diligence, Promptness and Punctuality
(a) Defense counsel should act with diligence and promptness in representing a client, and should avoid unnecessary delay in the disposition of cases.
(e) Defense counsel should be punctual in attendance at court, in the submission of motions, briefs, and other papers, and in dealings with opposing counsel, witnesses and others.

Standard 4-3.2    Seeking a Detained Client's Release from Custody, or Reduction in Custodial Conditions
(a) In every case where the client is detained, defense counsel should discuss with the client, as promptly as possible, the client's custodial or release status and determine whether release, a change in release conditions, or less restrictive custodial conditions, should be sought.

Standard 4-4.1 Duty to Investigate and Engage Investigators
(a) Defense counsel has a duty to investigate in all cases, and to determine whether there is a sufficient factual basis for criminal charges.
(c) Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter, consequences of the criminal proceedings, and potential dispositions and penalties. Although investigation will vary depending on the circumstances, it should always be shaped by what is in the client's best interests, after consultation with the client. Defense counsel's investigation of the merits of the criminal charges should include efforts to secure relevant information in the possession of the prosecution, law enforcement authorities, and others, as well as independent investigation. Counsel's investigation should also include evaluation of the prosecution's evidence (including possible re-testing or re-evaluation of physical, forensic, and expert evidence) and consideration of inconsistencies, potential avenues of impeachment of prosecution witnesses, and other possible suspects and alternative theories that the evidence may raise.

Standard 4-4.3    Relationship With Witnesses
(c) Defense counsel or counsel's agents should seek to interview all witnesses, including seeking to interview the victim or victims, and should not act to intimidate or unduly influence any witness.

Standard 4-5.1 Advising the Client
(e) Defense counsel should provide the client with advice sufficiently in advance of decisions to allow the client to consider available options, and avoid unnecessarily rushing the accused into decisions.
(f) Defense counsel should not intentionally understate or overstate the risks, hazards, or prospects of the case or exert undue influence on the client's decisions regarding a plea.

Standard 4-5.4 Consideration of Collateral Consequences

(a) Defense counsel should identify, and advise the client of, collateral consequences that may arise from charge, plea or conviction. Counsel should investigate consequences under applicable federal, state, and local laws, and seek assistance from others with greater knowledge in specialized areas in order to be adequately informed as to the existence and details of relevant collateral consequences. Such advice should be provided sufficiently in advance that it may be fairly considered in a decision to pursue trial, plea, or other dispositions.

Standard 4-6.1 Duty to Explore Disposition Without Trial

(b) In every criminal matter, defense counsel should consider the individual circumstances of the case and of the client, and should not recommend to a client acceptance of a disposition offer unless and until appropriate investigation and study of the matter has been completed. Such study should include discussion with the client and an analysis of relevant law, the prosecution's evidence, and potential dispositions and relevant collateral consequences. Defense counsel should advise against a guilty plea at the first appearance, unless, after discussion with the client, a speedy disposition is clearly in the client's best interest.

Standard 4-6.2 Negotiated Disposition Discussions

(c) Defense counsel should ensure that the client understands any proposed disposition agreement, including its direct and possible collateral consequences.

(d) Defense counsel should not recommend to a defendant acceptance of a disposition without appropriate investigation. Before accepting or advising a disposition, defense counsel should request that the prosecution disclose any information that tends to negate guilt, mitigates the offense or is likely to reduce punishment.

Standard 4-6.3   Plea Agreements and Other Negotiated Dispositions

(e) Defense counsel should investigate and be knowledgeable about sentencing procedures, law, and alternatives, collateral consequences and likely outcomes, and the practices of the sentencing judge, and advise the client on these topics before permitting the client to enter a negotiated disposition. Counsel should also consider and explain to the client how specific terms of an agreement are likely to be implemented.

ABA Criminal Justice Standards for the Defense Function (4th ed. 2017).   Mr. Pretzer's performance in Mr. Stubbs' case violates each one of the above standards set by the ABA.

Mr. Stubbs argues that Mr. Pretzer's failure to adequately explain the consequences of deferred adjudication and the sex offender registration law as applied to him are independent grounds for finding Mr. Pretzer ineffective.  See, Lee v. United States, 137 S.Ct. 1958 (2017)(lawyer ineffective for misrepresenting deportation consequences, and it was not irrational to reject the plea deal when there was some chance to void deportation, however remote); Tovar Mendoza v. Hatch, 620 F.3d 1261 (10th Cir. 2010)(Counsel ineffective for making blatant and significant misrepresentations regarding the sentence the petitioner would receive if he entered a no contest plea.); Bauder v. Dept.of Corrections, State of Florida, 619 F.3d 1272 (11th Cir. 2010)(lawyer ineffective for misinforming petitioner that his no contest plea would not expose him to subsequent sexually violent predator civil commitment proceedings).  Mr. Stubbs also argues that Mr. Prezter's failure to appropriately investigate the potential (and in the end actual) exculpatory evidence is another independent ground for finding Mr. Pretzer ineffective. Kimmelman v. Morrison, 477 U.S. 365, 385-91 (1986)(lawyer ineffective for failing to conduct pretrial discovery and file a motion to suppress); Roberts v. Howton, 13 F.Supp. 3d 1077 (D. Ore. 2014)(lawyer ineffective for relying on

state's representation of the evidence without adequately investigating. Lawyer's conduct was "particularly troubling" in light of the fact that that state's representation was "preliminary."). As well, he believes that Mr. Pretzer's failure to adequately explain the nature of and potential consequences of the pending DPS reports is yet another independent basis for finding ineffective assistance of counsel. See, Heard v. Addison, 728 F.3d 1170 (10th Cir. 2013)(counsel was ineffective in lewd molestation case for failing to recognize a likely defense before advising the defendant to plead guilty and in failing to advise the defendant of the possibility of filing an appeal following the plea.).

However, Mr. Stubbs' strongest argument is the inquiry of whether Mr. Pretzer's "assistance was reasonable considering all the circumstances." See, Strickland, at 694. It is the cumulative nature of Mr. Pretzer's act and omissions that demonstrates the deficiency in his lawyering and the resulting prejudice. Mr. Prezter's substandard performance that led him to accept a plea deal and that, but for the accumulation of Mr. Prezter's acts and omissions, rendering Mr. Stubbs hopeless before the trial court, Mr. Stubbs would not have pled guilty.

Therefore, the the State courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence. In light of Mr. Stubbs' case, no "fair-minded jurist could agree" that the State court's decision on Mr. Pretzer's performance was correct. Id. An

appropriately thorough look at Mr. Stubbs' claims demonstrates a reasonable probability that, but for Mr. Pretzer's errors, Mr. Stubbs would not have pleaded guilty and would have pressed on seeking release on bond and ultimately elected to try his case to a jury.  See, Hill, 474 U.S. at 58-59.

**B.     As the Result of Mr. Pretzer's Ineffective Assistance of Counsel Mr. Stubbs Guilty Plea Was Not Knowing or Voluntary**

Mr. Stubbs may attack the voluntariness of his plea when counsel did not provide him with reasonably competent advice.  Cuyler v. Sullivan, 446 U.S. 335, 344 (1980), see also, Tollett v. Henderson, 411 U.S. 258, 267-268 (1973).   As argued above, Mr. Pretzer's performance that led to Mr. Stubbs' guilty plea was legally ineffective, and; therefore, Mr. Stubbs' plea was not knowing or voluntary.

**C.     Actual Innocence**

A colorable showing of actual innocence functions as a gateway to excuse procedural default of available state remedies.   Schulp v. Delo, 513 U.S. 289, 314-315 (1995).  Such a colorable showing of actual innocence may be established in the context of a guilty plea.  Bousely v United States, 523 U.S. 614, 624 (1998).  Aside from the gateway function an actual innocence claim is a ground for federal habeas relief if there is an independent constitutional violation.  Herrera v. Collins, 506 U.S. 390 (1993).

In light of new evidence, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  Schulp, 513 U.S. at 329.  In this case

there was new evidence, namely all the evidence that came to light after Mr. Stubbs pled guilty: both DPS forensic reports and the Facebook post. Mr. Pretzer was ineffective, and his ineffective assistance of counsel caused Mr. Stubbs' plea to be unknowing and involuntary. Therefore, Mr. Stubbs' new evidence claim should not fail because he failed to show due diligence in waiting for the DPS forensic reports to arrive or to discover the Facebook post.

As discussed above, the exculpatory and favorably impeaching evidence in this case was substantial: the "medical findings" were inconsistent with the outcry, L.R. made inconsistent renditions of the manner in which the assault occurred, there were two written recantations and a video recantation in which L.R. explained her motive for lying, two previous unfounded outcries of sexual abuse spoken by L.R., one against Mr. Stubbs when he may have been in Wisconsin, Ms. Lopez stated that she believed L.R. way lying about the abuse, there was a Facebook post of significant impeachment value, and the exculpatory DNA laboratory results supporting Mr. Stubbs' denial: "the proof is right there in the swabs." <u>See</u>, *supra*. Mr. Stubbs' case presents a colorable showing of actual innocence such that no reasonably acting juror would have found him guilty beyond a reasonable doubt. Therefore, Mr. Stubbs has established a gateway to excuse procedural default, if the Court should find any. Also, with the independent constitutional violation in Mr. Pretzer's ineffective assistance of counsel, actual innocence serves as a ground for federal habeas relief.

Respectfully submitted,

By /s/ Stephen W. Byrne
STEPHEN W. BYRNE
Texas State Bar No. 24050365
So. Dist. Of Texas No. 638575
615 N. Upper Broadway Street
Suite 900
Corpus Christi, Texas 78401
 Telephone: (361) 877-2099
 Fax:    (361) 288-8932

## CERTIFICATE OF SERVICE

I, Stephen Byrne, certify that on the 27th day of April 2021, a copy of the foregoing notice was served via electronic notification to Jessica Manojlovich, Assistant Texas Attorney General, Austin, Texas.

 s/Stephen W. Byrne
STEPHEN W. BYRNE